Health Resources and Services Administration, Xavier Becerra, Secretary, United States Department of Health and Human Services, Mr. Aguilar for the imbalance, Ms. Stetson for the Affiliate Novartis Pharmaceuticals Corporation, Mr. Berry for the Affiliate United Therapeutics Corporation. Good morning, whenever you're ready. Good morning, may I please support Daniel Aguilar for the federal defendants. Congress enacted the 340B statute to ensure that covered entities, like federally funded health clinics and children's hospitals, could receive medications at a discounted price. The statute represents a carefully calibrated scheme that entrusts HHS with oversight over both drug manufacturers and covered entities. If manufacturers have a complaint, Congress established an Administrative Dispute Resolution process to address it. But what manufacturers may not do, and have not done until the last two years, is to impose their own sui generis unilateral conditions on what covered entities must do before they can purchase drugs at the statutorily discounted price. I can understand why you're worried about an unfettered power to impose conditions, but the rationale in the order under review is that the manufacturers can't impose any conditions. That seems awfully hard to accept. I don't think so, Your Honor. Can they require delivery on planet Earth? So if you're talking about the advisory... Okay, that's an absurd hypothetical, and I normally wouldn't use it, except that that was one thing your agency GC said. So, obviously, two things, Your Honor. One, that's withdrawn. It's not at issue here. And two, as we know, and we... Okay, but the logic of your position is no conditions. As we know that a replicant needs to be dispensed pursuant to a prescription, which means logistically it needs to be at a pharmacy or at a doctor's office. And, obviously, we're not talking about general practices. They just have a business. Like, we need to know the bank account number in order to process this, or we need to know the address at which we're shipping it to them. Those are logistical things. Those aren't at issue here. What we are talking about, though, are particular policies that are targeted at 340B covered entities. And at that point, what I take plaintiffs and other manufacturers' positions to be, and this isn't me mischaracterizing it. This is in the letters that they sent to HHS that we discussed in our opening brief, I think on page 16, is we have no obligation under the statute to ship to any contract pharmacy. And I think, as Eli Lilly noted in their brief that's currently pending in the Seventh Circuit, at common law, the seller of the goods wasn't required to ship anywhere. You could make the person come and pick them up at your headquarters. And so I think what they're saying is, look, we have some reasonable conditions. We think this is all right. But that doesn't comport with the statutory text. Addendum 1 of our brief, it's the statutory text, it's A1. It says that the drug manufacturer needs to enter into a contract with the secretary to sell drugs at the covered price, and the manufacturer shall offer those drugs to covered entities if it makes those drugs otherwise available. That is an unqualified obligation. And I think what plaintiffs are saying is that, well, that only talks about price. And so, therefore, we can impose any other conditions that we want. And they're reasonable, and maybe we have on some A-textual gloss to that to sort of make it sound good. But also, if you notice, the statute doesn't talk about quantity. There's nothing that says, well, we can restrict you to 100 pills. We think that's sufficient for this month, and if you want more, well, that's just too much of a burden. Or, well, you can only have one contact pharmacy if you're a children's hospital, but no others. Or whatever other conditions they want. That's not the scheme that Congress put in place. I take their policies to be driven by a desire to combat what they see as potential statutory violations, duplicate discounts, or diversion. If they impose a commercially reasonable condition, a commonly used condition, or maybe if they impose a relatively easy-to-meet condition that's closely tailored to fighting diversion, what specific statutory language have they violated? They've still made an offer. And they're still offering a ceiling price. I think it is that adding on additional conditions like that, even if they purport to be consistent with the statute, the statute represents a carefully calibrated scheme, and there's no room for them. You keep saying that, but all the statute says is they have to make an offer for a purchase at a price. And so what I would direct the court to is the rest of the statutory scheme as a whole. So, Your Honor, if they're concerned about duplicate discounts, the statute provides a reticulated mechanism for addressing those. First, the manufacturer has to undertake an audit of the cover density at the manufacturer's expense. That's at the end of page 5. That's a statutory requirement. After that's completed, then you can start the administrative dispute process. But why does the fact that the manufacturers can conduct an audit limit the conditions they can place on an offer? And so the government's primary position here seems to be that because the statute doesn't permit conditions, that all the conditions, like any conditions, are prohibited. I mean, doesn't that sort of flip things around? I mean, don't we sort of have a baseline in our society of private contractual agreements unless they are prohibited by Congress? I take that as a general background point, but I don't think it answers the question here, because the particular worry that they're trying to address, right, is a duplicate discount or a diversion. And they say, well, we want to stop that at the front end. The statutory scheme says, no, we address that at the back end. That's a choice Congress has made. At the end of page 5, that's a statutory point that says, if a covered entity commits a statutory violation, the remedy is for the covered entity to pay back. That's one remedy, but I'm not sure that the existence of such a remedy precludes reasonable conditions on the front end. What's the connection between those two things? I mean, is there anything in the statutory structure that suggests that the audit is the only way that manufacturers may police these concerns? Well, I think the important thing there is that it's not necessarily the manufacturers that Congress has entrusted to police these concerns. It's the federal government. It says that HHS is the one that can impose sanctions and compliance and kick covered entities out of the program if they, for instance, fail to certify or kick manufacturers or impose fines on them if they commit statutory violations. That's a choice Congress has made. And I think that's entirely consistent with the Supreme Court's decision in ASTRA, right? And then ASTRA-USA versus Santa Clara County, that was a case where covered entities tried to sue the manufacturers to enforce the statutory conditions. They said this is entirely consistent with the scheme. The Supreme Court rejected that, said, no, you can't sue because what Congress has done with 340B is place a centralized enforcement mechanism with the federal government. And it would contradict that system and impose a myriad of different compliance schemes if we let each covered entity bring this private suit. And that's why when you have a sophisticated, articulated scheme like this that Congress in the Affordable Care Act amended to add in additional compliance mechanisms and enforcement mechanisms, you say, well, is it consistent with that statutory scheme to allow drug manufacturers, 700 of whom participate in this program, to impose their own conditions on when any covered entity can access the drug at all at the 340B price. And at the time the statute was enacted, Congress knew that the vast majority of covered entities did not have their own in-house pharmacies. They had to rely on outside pharmacies. And it makes good sense to try to do that because a lot of these patients, right, in the 340B program are rural or they're poor. They have nine to five jobs Monday through Friday. And a lot of covered entities in house pharmacies, as the administrative record demonstrated, are only open during that time. The best way to get these drugs to the patients oftentimes is through an outside pharmacy that's dedicated to that purpose. And a lot of the covered entities explain, you know, it would be cost prohibitive for us to spend a lot. What is the government's understanding of what the companies here have suggested is sort of a massive transfer of money from the pharmaceutical companies to pharmacies and covered entities because of the way the billing works? I mean, surely the government doesn't think that was the purpose of the 340B program. I think the purpose of the 340B program was to provide these discounted drugs to the covered entities. So they go on. And I think for that concern, I mean, that is something that Congress is well aware of. And I think the 2018 GAO report, which we cite, it kind of explains this and explains what fees are in there. At the back of the 2018 report, the table that show the fees or the fixed fees, they're fairly minor. It's $7 to $8, $15. I know in one place there's a fairly large fee for a brand name drug where I think it's Hepatitis C. And then right below that, it says that pharmacy also charges $0. No fee at all for the generic version of that drug. So these are pharmacies that are taking some of these and third-party administrators that go through and try to make sure that any discount that's being applied is consistent with the program. And they do have some administrative fees for that. But as the report also notes, the majority of the covered entities that they surveyed passed on savings directly to the patients. And I'd like to back you up a little bit on the issue of essentially ripeness in some of the procedures. OK, sorry, I'd like to back you up on the issue of ripeness in some of the procedural issues. It appears that the parties have agreed that that violation letter was the final agency action. And so that the district court had the ability to actually consider this matter. But is that a finding that the parties can just concede to, or is it something that this court must make as a final action? As I understand it, final agency action in the D.C. circuit is a merits question. And so I don't think it's a jurisdictional bar, unless I'm mistaken. Under the APA, that's right. Yes. There's no special review scheme here. This is a standard APA. Yeah, and I agree with that. But then does it go to ripeness? Because I've got the issue of the district court only deciding certain issues, closing the record, but essentially leaving open certain issues. There are certain issues that were appealed by Novartis, certain issues appealed by United. But you all are not here essentially on the same issues because they have left open the issue about specific conditions, as opposed to just whether or not there's a prohibition on or any and all conditions. So I think this will address your question, and if it doesn't, let me know. The question that we heard today, as I understand it, and the parties have joined issue on is a pure one of law. It is what does the statute require? And I think drug manufacturers' position on this is that the statute allows us to impose these conditions that are at issue and allows us to limit the shipment to contract pharmacies. And the government's position is the statute represents a carefully articulated scheme that doesn't leave room for manufacturers to impose these unilateral conditions, whatever they are, even if they attempt to be sounding consistently with the statutory scheme. And just to be clear, that's a consistent position that HHS has taken since the statute was enacted. I think as early as 1993, drug manufacturers said, can we just have as a condition of shipping out these drugs that the covered entity assures us that it's in compliance with the statute. But do you believe that the district court is, what specifically do you understand the district court is leaving open, essentially? Even though it closed the record, it appears to not address certain questions, but leaves open other questions. And so I'm just curious as to what you are expecting us to accomplish here, but that the district court believes that it still has the case. I'm not exactly sure what the district court meant to leave open. I know that it at least specifically said that it wasn't considering whether these particular policies were consistent with it. Let me just try to add a related thought, which is, I think there's probably final agency action which was reviewable by the district court. But why is the district court's order final under section 1291 reviewable by us? It's a little bit schizophrenic. I mean, she says, I'm done with the case. I closed the case. On the other hand, she leaves an issue open and says, I'm not addressing it at this time. As I understand it, Your Honor, I think what the district court said is that as I read the violation letter, I think that that is arbitrary and capricious being inconsistent with the statute. And I think that if HHS wanted to, it could take another go at this and maybe come up with something else. But your friends on the other side had what I think was styled as a different claim. It's really a request for additional relief, right, fully enjoining enforcement. And she declined to either enjoin that or allow it. She said it's an open question. She wasn't resolving at this time. But what the district court did resolve is the legal question. It said that manufacturers can impose these unilateral conditions and that the statute doesn't prohibit that. And that's the basis for HHS's enforcement letters. It's the basis for the enforcement actions we have going on across multiple courts. That's what this dispute is here. And as I understand it, that is just a pure question of law for this court. What does the statute mean? What does it require? And does it allow the manufacturers to do anything like this? And I think the parties have a fully joined issue on that and that this court can rule on that question. But the district court only issued a partial summary judgment, right? As I understand it, it was working. Leaving aside the injunctive, the claim for injunctive relief. With no 54B certification. Right. As I understood it, it was a final judgment. I'm not prepared to answer that question right now, Your Honor, because it wasn't something that had been highlighted in the briefing. If the court wanted supplemental briefing on it, we'd be happy to answer it. Can I ask you a question about how to understand HHS's enforcement letter? So primary legal argument given is that no conditions are allowed to be, you know, manufacturers can put no conditions when making an offer. Do you take the enforcement letters to also be saying that these specific conditions are unlawful? Yes, because that's why we sent them to the individual manufacturers, right? We sent one to Novartis, one to United Therapeutics and to others. So they're really they're sort of the general principle. No conditions are permissible. And also these conditions violate the statute. Yes, Your Honor. That's how you understand. Yes. Suppose I disagree with you that the statute prohibits imposing conditions. I know you want to fight that, but just take that as a given. Suppose also I think that an unfettered ability to impose conditions, right, at some point would either mean that there's no bona fide offer or would trigger the conditions become too onerous, would trigger some idea of frustration of purpose or the predicate act canon or something like that. What guidance would you give us on drawing a line to explain the point at which the conditions would do either of those? Honestly, Your Honor, I'm not certain. I'm not certain how that line would be administered. I know plaintiffs support a bona fide offer. I'd gloss on this to try to say that that could curtail certain abuses. I'm not sure what that looks like. Which is why this is a tough case, because either extreme looks pretty unattractive. I think what we can say is that this is a statute that isn't susceptible to many canons of interpretation. We offer ours. They offer theirs. We think the best reading of the statute is ours. It doesn't mean at first glance, you know, that it is obviously resolvable. But after close textual analysis, applying the Supreme Court's precedence on this issue, we think that ultimately ours is the better reading. That's the question of law here. This isn't something where Congress has allowed HHS legislative rulemaking to address this particular issue, right? So there's nothing left for the agency to do to further clarify this issue. If Congress wants to amend the statute, it obviously can. But as the statute stands right now, it is a question of law about how best the statute reads. And we think that that's a question that this court ought to resolve. Can I ask you, after the district court opinion in this case, has HHS issued any enforcement letters that offer specific, like enforcement letters against pharmaceutical companies that offer specific reasons why certain conditions are inconsistent with 340B? Not to my knowledge. Can't they change their sort of enforcement practice? Not to my knowledge, Your Honor, because as I understand, it's been the agency's consistent position that this is not something where either the covered entities or the manufacturers can add on other additions or other enforcement mechanisms. This is solely within the federal government's purview. So they haven't tried to kind of follow Judge Friedrich's idea of offering more specific arguments? Not to my knowledge, Your Honor. So following up on that, again, same assumptions, right? I think some conditions are okay, but at some point comes a problem. So suppose we set aside the orders under review insofar as they rest on the theory that no conditions can be imposed, but still have this concern about there have to be some limits. And then we're faced with an issue of is a 40-mile radius too onerous, and are these reporting requirements too onerous? Should we get into that, or should we just do something akin to what Judge Friedrich did? I'll restate it a little bit, which is not kind of a, you know, resolve some claims but not others, but we would say that the rationale the agency has put forward to us, which is no conditions are valid, we set aside and, you know, we would have a Chenery problem if we went farther and tried to get into 40 miles versus 20 miles. That's just not the rationale asserted in the order under review. I don't know that it's necessarily a Chenery problem, but what I would say is if you're getting into that kind of what is an onerous restriction, what is reasonable. I'm a Chenery insofar as you haven't – you've given us a no conditions position. You haven't given us a fallback that if we're talking about bona fide offer or frustration of purpose, you know, we're doing some kind of balancing and here's why these fall on one side of a line rather than another. That's not a rationale that you've put to us. It's not for this reason, because at that point what still is going to happen is that the drug manufacturers will have whatever policies that they do. And it's stopping the covered entities from being able to purchase the drugs at the discounted price for the contract pharmacies. And so then you're going to have litigation for each and every drug manufacturer that is like, well, what are the particular terms of this? Is this reasonable? So it can be broadened in different courts based on that. And you're going to have – I don't exactly know how that's going to end up being workable. And also at that point, it is getting pretty far afield from the textual scheme that's been laid out here. And you're having more sort of common law set up about like what is best compliant with this. And I think that that actually is a better job. Which is a further statement of your argument in favor of a no conditions rule. But it doesn't really help me on if we're trying to distinguish among conditions, should we start that process with a 40-mile radius in this case, in this appeal, or should we just leave it for? Some kind of future enforcement action. Just two points. First is that I think every drug manufacturer obviously is going to say our conditions are reasonable. Right? And that's why we – Sure. There will be case-by-case litigation. And so even given that, you can look at the administrative record that we cited, I think, at page 19 of our opening brief that showed after just E6 manufacturers that are currently in the course of appeals instituted their policy, within a month after their policies were instituted, 340B sales dropped 70% for those manufacturers. And the analysis was that for the course of a fiscal year, there would be $3 billion in lost savings. So I think that if you're just even looking at these particular policies, I don't think that qualifies as reasonable. It really does qualify as onerous. But that just depends on where that money was going before. Right? If it was being diverted or, you know, in some other way being spent inconsistently with the statute. Well, just to take a – I mean, it's only a problem if that money was previously going to its intended beneficiaries. So to be clear, I think it is going to its intended beneficiaries, even if you're using a contract pharmacy and paying an administrative fee. Right? That's a cash flow issue. You're using the contract pharmacy to make sure that you don't have to spend the money and upkeep and compliance with various controlled substances laws to have that pharmacy and be able to dispense it to your patients. But even for – I'm sorry, Your Honor. I mean, just following up on Judge Katsos' question, I mean, if, you know, I mean, if this court were to follow the same reasoning of the district court and say that at least some conditions are permissible, well, presumably HHS would then have to, in their enforcement letters, articulate, you know, and develop some more specific guidelines for when they enforce against the conditions that manufacturers are imposing. And then those would then be reviewed in the litigation. I think the statute already does that. It says you can bring an enforcement action and sanction a drug manufacturer not just for any violation, but when the violations satisfy this particular statutory criteria. And that was something that Congress enacted. Again, I'm just not sure exactly how HHS is supposed to be deciding at the front end whether something's reasonable or onerous, if it's consistent with the statute or not. What we know from cases that the Supreme Court's decided, like County of Maui or Jevic Holding, is even if you say that something is entirely consistent with the statutory scheme, when it works to frustrate its intent and it's not consistent with how it actually operates and allows for practices, essentially, that is inconsistent with the statutory scheme. And you can read the statute as properly forbidding that circumvention of its operation. And I think that's an entirely reasonable holding for this court to take. Judge Rao, anything else? Judge Childs? Nothing else. Thank you. Okay, thank you. We'll give you some rebuttal. Thank you. Stetson, good morning. Good morning, Your Honors, and may it please the Court. My name is Kate Stetson. I'm representing the appellee Novartis. Mr. Aguilar said a few minutes ago that this is a standard APA case. This is not, as you likely recognize, a standard APA case. One of the reasons I think the district court wrote the opinion she did is because of the way the government has chosen to and had to litigate this case in the first instance. HRSA, as you know, only has very limited rulemaking authority. And that led HRSA, when it decided that these contract pharmacy policies that were being put in place were violative of the statute, HRSA's only recourse was to argue that those policies, all of them, any conditions whatsoever, were violative of the plain text of the 340B statute. But that's a strange argument for HRSA to have to make, and it's probably why we didn't get to the text of the statute until about four minutes into Mr. Aguilar's argument. We don't dispute, just in terms of the procedural posture, we don't dispute that was final agency action. We do not dispute. Reviewable through the APA. Correct. Under normal APA. We do not dispute that it was final agency action, nor do I think there's any issue with Judge Friedrich's opinion. I think what Judge Friedrich held was the rationale the government has brought to me is unlawful. The idea that these contract pharmacy policies, all of them, of whatever stripe, violate the 340B statute because they purport to place conditions not on the offer, by the way, but on delivery. Before we just get into those matters, could you just address our jurisdiction here? Because there was a claim for injunctive relief below, and then there was partial summary judgment. Yes. So I think the fact that Judge Friedrich held that the government's interpretation was unlawful resolved the case. Now, what we had asked for was an additional remedy. We had asked for Judge Friedrich to take one further step and say not only is the interpretation the government offered unlawful, but Novartis's policy is lawful under the statute. The conditions are more than reasonable. So have you abandoned that claim then, the claim for injunctive relief? I don't think we've abandoned the claim, nor did we have to cross-appeal it, because the relief was full and complete as far as we were concerned. The government's interpretation was held unlawful. To your point, though, Judge Rao, I wouldn't describe it as having left something open for purposes of appellate review. I think what Judge Friedrich was trying to do was to leave something open for the government, if it had available to it any other statutory textual argument to support the idea that conditions on delivery of 340B-priced drugs to contract pharmacies were unlawful, that it should offer it. And that's why I think your question to Mr. Aguilar about whether any other reasons have been offered in these subsequent violation letters is quite important. The only thing Judge Friedrich left open wasn't something for her to consider. It was an opportunity for the government, if it had any argument available to it, to try to argue some other statutory basis for its statutory argument. In the case before her or somewhere else? No, I think somewhere else. I think Judge Friedrich and these other judges are well aware that there are a number of these cases going on. Sorry, go ahead. No. I mean, that would make it a perfectly sensible ad law disposition. She said some things that might tend to suggest that there was more work in the case before her. I don't think so. I think, as I mentioned a couple minutes ago, the reason Judge Friedrich, we think, wrote the opinion she did was because the government made the argument it did. The government's argument, and this was your colleague with Mr. Aguilar, is that the words offer and purchase, first it started with offer and then in the district court pivoted to purchase, that that somehow brings along with it in its wake this massive set of requirements on all other conditions that a manufacturer could possibly place, including on delivery. And that simply is not supported by the text of the statute. The other thing I would point you to, and this goes to your question, Judge Rao, is if you go back and look at the violation letter itself, the phrasing of it is really remarkable, we think, because what the letter says is, Adrienne, we are Joint Appendix 35. Nothing in the statute grants a manufacturer the right to place conditions on its offer of a discounted price. And that, as you mentioned, Judge Rao, is a complete 180 from the way the statutes are interpreted. Agencies need to have their authority specifically granted by statute. Private companies do not. Private companies are allowed to act within the bounds of the law. And I think what Mr. Aguilar and what DOJ is arguing here is that the law somehow embraces a huge number of conditions that simply aren't on the face of the statute. Now, Judge Katsas, you asked whether these two polar extremes are kind of— You need to give me a limiting principle. I can, and it's the principle that Judge Friedrich offered. Bonify the offer? Yes.  Okay, suppose your client imposed a condition, no delivery to contract pharmacies, period, full stop. Awful? I think that that would actually be the closest question because, of course, that was the regime from 1992 to 1996. There were no deliveries to contract pharmacies. The reason for this statute, as we know, was to permit covered entities the purchasing power to get more drugs for their scarce money. So that's the toughest question. No manufacturer of which I am aware has that policy in place. Well, I know, but your theory, just like the government's theory, might imply a lot of difficult results. Your theory seems to imply that that condition, that hypothetical condition, would be just fine. I mean, there's an offer. It's at the price, and it's for the purchase, and the statute's satisfied. I think I tried to make the point that we don't think that it's an easy question. We don't think that imposing a condition that says no delivery on contract pharmacies— On your textual reading of the statute, why is that a hard case? I think it's a harder case because I think it does step a little bit closer to the question about what constitutes a bona fide offer. But I think when it comes to the question of a bona fide offer in these circumstances, Novartis's, for example, when you have a radius of 5,000 square miles plus no federal grantees plus exceptions, I think what the manufacturers are trying to do here is to walk this balance between understanding and fulfilling not just their statutory obligations, which, to your point, don't carry any implications for contract pharmacies, but also carrying out the purposes of the statute that they've been, alongside HHS, carrying out since 1992. So does the bona fide-ness of the offer, do we look to ordinary commercial practices, or are we also rebuilding into that concept some idea of frustration of statutory purpose? I think we look to ordinary commercial practices, and I think that's an important point in this context as well. But not frustration of purpose? Not, I think, frustration of purpose, no. Because now we're just talking about a contracting, as the government has said in many other contexts, the head of versus OPA. I'm sorry, let me give you one other hypothetical then, which is suppose they said the buyer of the drugs must take delivery at our plant. Which is the default UCC rule in the absence of a contract term, right? The seller, the buyer goes to the seller. I think that, I would put that in the same category as refusing to deliver to contract pharmacies. I think that is a closer question, but I'm not prepared under the statutory text to conclude that that is not a bona fide offer. The statutory text requires us to make an offer for purchase to a covered entity. To your point, Judge Katz, when you think about writing this opinion, what you have to do now versus what can be done later, I think for these purposes what the government has brought you is this kind of one size fits all, any condition is no good, cookie cutter argument that they have made across all conditions. I think to the extent that the government, despite having had in place a policy from 1996 to 2010 that permitted just one contract pharmacy, wants to argue that any of these manufacturers' policies is something less than a bona fide offer, which it has never argued in any of these cases of which I'm familiar. And it can do that, but what we're here on a statutory interpretation that simply can't be supported. It doesn't bona fide, though. You said that you shouldn't take into account frustration of statutory purposes in your answer to Judge Katz's, but doesn't bona fide take into account the context, right, which is the statutory scheme, so maybe not frustration of some very broad understanding of purpose, but doesn't it have to be a good faith offer within what the statute requires manufacturers to do? I think it certainly does, and I'm conscious that I'm going into my colleague's time, so I want to make sure. We'll give you time. I think it certainly does, but I don't think that that necessarily diverges at all from what you would expect a bona fide offer to be. A bona fide offer for purchase comes along with a number of conditions, and to the point about whether this is any different from any other commercial transaction, I can tell you these types of unilateral covered entity directed, where the covered entity gets to direct where the drugs are delivered, including to the moon, are unheard of. They are not occurring in the wild. They are just a creature of this world. So there is nothing unique about what these manufacturers are putting in place. They are simply putting in place reasonable conditions on their delivery requirements. Let me ask you, so your colleague on the other side said these enforcement letters should be understood both as taking the broad position that no conditions are permitted and also the more specific enforcement idea that these conditions are inconsistent with the statute. But you've argued in your briefs that we don't need to reach that second question. I'm wondering why. I think our primary argument in the brief is that the district judge was able to and did stop at that initial legal question, the legal question that Mr. Aguilar referred to. Does this statute support the government's interpretation, yes or no? The answer was no, and so the district court didn't feel the need to go on to the remedy question that we had. It's not just the remedy question, but really there are, I mean, I think a fair reading of these letters are, as HHS has said, I mean, there are two, there's sort of the principle no conditions and also that these conditions are unlawful. So even if we agreed with the district court that, you know, the no conditions idea is inconsistent with the statute, don't we still need to decide whether these specific questions that Novartis has placed are consistent with 340B? I mean, it seems that that question is still left. I think it is left. I think the question becomes one of timing. You know, what the government has asked in its brief is for you to disagree with the district court on its holding and to go further and rule that our policy is not. Well, assuming you agree with the district court, don't we have to go another step to determine whether the specific conditions are consistent with the statute? I think if you felt like you needed to go that extra step, and I don't know that you would need to, I could see this, I could see you ruling that because there is a statutory basis for a reasonable condition on an offer, it's a bona fide offer. It travels along with that word offer because it's a familiar commercial context. And I would be comfortable if you wanted to look at Novartis' policies and conclude. But what is it that needs to be developed, if anything, in the record as to that second question? It seems like the district court kind of withheld response on that question based on a further factual development. I don't think anything needs to be developed in the record, Judge Childs. I think the record as it arrived to us was the administrative record that the agency relied upon, and that might have been Judge Friedrich's reluctance to do more. But as the record stands, there's no factual dispute about what Novartis' policy is. There's no factual dispute that there is no evidence offered in the violation letter that Novartis' policy has prevented anyone, any covered entity, from accessing the drugs. What you heard Mr. Aguilar say earlier is that these policies are designed to prevent access to the drug. That is simply not true. But this was an informal adjudication, right? There's no record to speak of about the specifics of 40-mile radius, is there? There is a record to speak of to the extent that these manufacturers, Novartis included, put in lengthy letters and comments to the agency explaining what their policies were and why they comported with both the text and the original purpose of the 340B statute. I do want to touch on that just for a moment. Assuming we reach that question, give me the 30-second version of why you think you win under 40-mile radius. We win under the 40-mile radius plus the carving out of all federal grantees from the policy, because of course federal grantees are required to put their revenue savings back into benefiting the populations they serve, plus the exceptions regime, because we think that is far and away a reasonable approach to curbing the kind of diversion that HRSA's own Office of Infectious Specter General and GAO have pointed out for a decade. The fact that the government itself had in place for 14 years a policy that just permitted one contract pharmacy in the event a covered entity didn't have its own, I think is the baseline that you can work from. Our policy goes well beyond that. I think I saw somewhere in these materials a very striking statistic that the average distance between the patient and the pharmacy is over 300 miles now. 327. Which, I don't know what to make of that. I mean, it might suggest that there's massive diversion going on, or it might suggest that these programs are operating in very rural areas, where it's really important to have as much distribution as you can. I'm not sure what to make of that. It is a striking statistic. I think in 2000 the average distance to a contract pharmacy was about 20 miles. I don't think the populations have changed. I think what you make of that statistic and others is that the 340B program, as many of us have said in our briefs, has really strayed from the purpose of the statute, which is to deliver additional benefits to underserved communities. To your point, Judge Rao, you talked about the intended beneficiaries of the 340B statute. The intended beneficiaries presumably are not Walgreens and CVS, both of whom said in their 10-Ks that if this case turned out poorly for them, they would suffer a material loss. The fact that this program has now been to the benefit of billions, with a B, dollars to those pharmacies I think tells you that these modest constraints that these manufacturers are putting in place are designed to make sure that their discounted drugs are going to the people who can actually use them. I don't know how much that statistic helps you, unless the pharmacy profit is connected to diversion. Because otherwise it's just the hospitals who are the primary beneficiaries are enlisting pharmacies and making it worth their while to do distribution to the hospital's patients, which is the whole point of the program. I think it helps us in two respects. If you go back and look at the 1992 report of this statute, and you look at the description in 1996, this statute was passed to enable covered entities to acquire the drugs they need at a much less expensive price. But what has now been put in place is this entire- For the purpose of benefiting their patients, and specifically not patients of other entities. Specifically not patients of other entities and not Walgreens 327 miles away. What this has morphed into is this bizarre, massive ecosystem of Walgreens and CVS and Walmart, all of them skimming off the top of the 340B revenues that are supposed to and designed to and were intended to, go to the hospitals themselves and the covered entities themselves so that they can be put back into service for underprivileged communities that they serve. Hospitals, of course, are under no obligation to do that. That's one of the reasons that we've carved out hospitals to apply this policy to and the federal grantees not to. But the bottom line I think here is the government has brought one interpretation to you. It is that the statute unambiguously requires us to comply with unilateral delivery directives. The answer to that is it doesn't. The answer to your questions is our policies are reasonable. Just one slight refinement to that. We're not reviewing this through Chevron, so there's no question of ambiguous or not. We're just figuring out the best reading of the statute. That is correct. The government hasn't. No, I know. But if the government's reading is better by 5149, they win. I'm not sure that that's, well, I actually wouldn't worry about that hypothetical because I don't think the government's reading is better. But if you conclude that the better reading of the statute is that it brings along with it this entire weight of restrictive delivery conditions, I think I would ask the question to Mr. Aguilar, as you did in the first, his opening argument, what text exactly does that depend on? Because it doesn't exist. Judge Rapp? There are no further questions. Judge Childs? Nothing further. Thank you. Thank you. May it please the court, Bill Perry for United Therapeutics. I'd like to start, if I might, by talking about the reasonableness of our policies condition. And there's two parts of United Therapeutics policy. The first regarding contract pharmacies deals essentially with two specialty    And the reason we do that is because patient safety is very important. We sell and we have to educate patients how to use the drugs. There's home health activities that are involved in that. But because we have a patient training, a mandate, what we do is sell through two specialty pharmacies. And in turn, there's really only one that's been a contract pharmacy up and out. And the point is they deliver by mail. Mr. Perry, before you get to your specific policies, what do you think is the test that this court should apply? I mean, if there are some conditions that pharmaceutical companies may impose, how do we determine which conditions are reasonable? I think Judge Friedrich's test is the right test, in part because it borrows directly from the statute, which is did we make a bona fide genuine offer? And, of course, I think we did. But I would suggest here there is absolutely no record that Justice has developed or HRSA has developed to suggest that there is no bona fide offer here. In fact, what they've done is take an absolutist position. No conditions at all are permitted rather than actually doing their job and going back and looking at the record, figuring out what each individual company has done or not done, and then creating the type of record on which they can make a judgment. So the bona fide term comes sort of by importing common law contract terms into what an offer means. Well, bona fide is a handy term, but really the question is have we offered? Right? So bona fide is one way I think we can think about that. Is it genuine? Is it a good-faith offer? But the question is, is it an offer? And I think, as my colleague Ms. Stetson said, certainly our programs are an offer. Certainly Novartis's programs are an offer. And I think if they want to try to draw a distinction between what's been done and what's required under the statute, they need a record showing that for some reason it's not a genuine offer. And they've got virtually nothing. Now, my colleague from the Department of Justice suggested that there was some type of record information suggesting that 70% of 340B discounts are no longer being given. That's certainly not evidence about my client. I don't think it's evidence about Novartis. I don't know where they're getting that, but they, of course, in their record, have assimilated data with respect to all sorts of other things. I just don't know what they're doing. The bottom line, I think, Your Honor, is that they are just assuming that no conditions are appropriate in developing a very sparse record that doesn't support what they've done to ARC. On the legal standard, if Bonafide is not doing a lot of work, then you could lawfully refuse to deliver to any contract pharmacy. Well, of course, we're not doing that, delivering to the one. But I think, Your Honor, the question is whether they have a record to suggest that the individual policy that you're implementing actually is somehow inconsistent with your obligation to offer. And so there are certainly a lot of hypotheticals that we can discuss. The government has said, what if you, for example, say, if you do business with my competitors, I will not provide you with a discount. That could be a problem. And you, I think, talked about lower orbit or some of the deliveries to the moon and so forth that we've seen in some of the rhetoric from the government. I don't mean to say that Bonafide isn't an important concept. What I'm saying is that shall offer is the most important concept. And there's a number of ways to analyze it, but I think Bonafide is perhaps the best way, and that's perhaps why Judge Friedrich selected it. So if we go that route and require some sort of more specific assessment of conditions, one of yours is this reporting requirement of certain data and such. You can easily imagine conditions like that that are de minimis, and you can easily imagine conditions like that that are hugely burdensome. So the devil is going to be in the details. So what do we know about the details of your conditions, and why should we get into that? Assuming hypothetically we've just set aside the no conditions. To take your first question, let me explain what we're doing with the claims data and why it's reasonable and why the record shows that. I see my time is up. We'll let you keep going. Thank you, Your Honor. First, what we've asked for is essentially eight data elements, and our understanding is that these data elements are routinely gathered at pharmacies all over the country. They overlap with the elements that are used for Medicare Part D drug reimbursement. They overlap and parallel, in some respects, what private insurers require. This is not an unreasonable thing to ask for. There is unrebutted evidence in the record. It's our declaration from Mr. Barton. You can find it at 539, JA 539, and specifically JA 577-78 addresses what the imposition is here on contract pharmacies or covered entities, whomever is responding. But it's really five minutes every two weeks or an hour per year to provide this information versus guidance. So there's a couple different guidance documents. I'm sure the court has read about them in the briefs, but one is from 2010. It's the one that talks about multiple contract pharmacies. And if that guidance is digested, if that guidance is complied with by the covered entities, there's no doubt they have this information. Well, let me provide three examples for the court on where they can find the guidance instructing the covered entities to ensure they have this information and the contract pharmacies. First, on 692 in the section on suggested contract provisions, there are provisions that address that. In the essential element section of that guidance, they instruct that covered entities should have this type of information available. In fact, they should conduct annual audits of the contract pharmacies. Of course, the inspector general in some of the materials in the JA, for example, says those aren't happening. But that's what this guidance actually says, and that reinforces the reasonableness of what we're doing. Third, in the pharmaceutical pricing agreement, that's the agreement that the secretary must enter with every manufacturer. There are specific provisions under which the secretary has obligated him or herself to ensure that the covered entities have these records and are gathering them. In other words, we're not asking them to do the impossible. These records exist, and there I would suggest JA 637. And similarly, on the top of JA 638, when you deal with what was then informal dispute resolution, the secretary has instructed us to try to work this out. Anytime we have a disagreement with a covered entity, we're instructed to try to work this out. This is the type of information we need to do that. This tells us, or will tell us when we get this information, what the duplicate discounts are and will give us clues. And then finally, Judge Friedrich mentioned this. You take a look at the ADR provision in the statute. ADR provision can only apply for a manufacturer. A manufacturer can only invoke ADR after doing an audit. So you have to do an audit first, right? But there's a precondition to doing an audit, and that is found in the HRSA guidance. And what the HRSA guidance says is that you have to have documentation of a reasonable cost audit. That's another purpose of going out and doing this. And what Judge Friedrich said about that is that, quote, for its part, United Therapeutics convincingly argues that the claims data conditions it has added to the policy will enable it to better utilize the anti-fraud audit and thus the ADR process. You made all these arguments to the agency on the facts. They haven't responded on the facts. They've responded with a very broad legal argument, no conditions. What we call the absolutist. Right. So shouldn't we be a little concerned about resolving the fact question without hearing from the agency at the same granular level that you just went through with me? Might I suggest this, Your Honor? If the court were to affirm Judge Friedrich's order, then, of course, they could see if they could perform a genuine investigation and come up with some type of basis to say we had an offer. Frankly, I don't think. Well, it depends on the ground on which we affirm. I mean, if we go all the way and affirm on the ground that your conditions are lawful, there would be nothing for them to investigate. I agree, and I'd prefer that. Sure. But we'd be resolving a bunch of factual questions without really hearing a lot from the government about them. I would suggest, Your Honor, to your question early in this session, the notice that letter on May 17th had a profound effect on us. Not only did it tell us very specifically that we had to grant these discounts in circumstances where we don't think were lawfully required. It said we should search out and find covered entities and rebate discounts that hadn't been given. And then it also said that we may be liable for civil monetary penalties under a different provision of statute. That's profound. And what Judge Friedrich did here was essentially take that off the table. Now, I might suggest, in a different context than I think you were asking, that the Bailion-Sperritt case, which is about whether something is or isn't a federal agency action, and the relevance that a letter in that case had to whether civil monetary penalties. No, I'm not getting into that. I'm at the last step of assuming hypothetically you've won on the broad legal. Mr. Perry, do you agree that deciding the specific questions about whether your conditions are reasonable is a fact question or is it a question of law? I think it is. Or is it a mixed question of fact and law? I'd like to say a question of law, in part because there should be no basis, given the record here, to conclude that we hadn't made an offer under the statute, which might be mixed, but I think it is better thought of as a question. Anything else? Judge Giles? Nothing further. Thank you, Mr. Perry. Thank you. Mr. Aguilar, some rebuttal. Thank you, Your Honor. Just on the question that you were posing to plaintiff's counsel on whether or not it would be lawful for them to just refuse to deliver to contract pharmacies, that was the position they took in their letters to HHS advising the government of their policies. That's at Joint Appendix 349 for Novartis and Joint Appendix 808 for United Therapeutics. They said they're not legally bound to honor any — What was the second? Oh, sorry, JA808. Right. They said they're not legally bound to honor any shift to order to a contract pharmacy. I think that is the logic of their position. And we've spent a lot of time talking about what makes it a bona fide. But it's not the position they've taken in their current policies. Right. Their current policies are basically noblesse oblige, right? We can do this as a favor to you. And I think that the problem that that runs into under the statutory scheme is that you're going to have a ratchet effect on this. If you're judging reasonableness, okay, well, this company's policy today is reasonable. Well, let's make it a little bit more restrictive. And let's see whether that stands up in court. And all of the time, because it's a preemptory policy at the front end, covered entities aren't able to purchase the drugs for shipment to contract pharmacies where the patients can actually get them. And if you look at page 17 of our brief, that causes real problems, real-world problems. One of the Crescent Community Health Center, for instance, was saying we expect as a result of these policies that are by the manufacturers across the country, right, to increase our cost to patients from about $180 a year to $5,000. We expect to lose about a million dollars in revenue and lose the ability to pay for our patients' co-pays. And there's a number of benefits that the state's amicus brief offers, page 18, about how covered entities can give a lot of extra benefits to their patients. And I think that it is really this restrictive web that's being imposed by not only these particular manufacturers, but those across the country. And that's why, if you could, I'd just direct the court's attention to page 120 of the Supreme Court's Santa Clara decision, where it was saying the covered entities wanted to be able to sue the manufacturers for statutory violations. And the court said, far from assisting HHS, I think it's that exact logic that explains why, given the reticulated statutory scheme that Congress had here, the unlimited requirement that you need to sell these drugs to these covered entities at a 340B price. That's why the best reading of the statute is that drug manufacturers may not impose these unilateral conditions. What do you make of the fact that the civil monetary penalties are only for overcharging, but have nothing to do with whether an offer was, you know, you can't impose civil monetary policies except for overcharging? I think I'd point to the administrative record where we have a number of instances where the covered entities are saying, we have put in purchase orders for these drugs at the 340B price, and the manufacturer has refused to sell us to them at that price because we're shipping them to a contract pharmacy. There are hundreds, if not thousands of pages of those where they particularly say we ordered six pills at this price. We were denied. If that kind of a denial for some reason doesn't count as saying, well, this is an overcharge because we're only going to sell it to you if it's at the higher retail price, then essentially it's allowing the manufacturers another backdoor. We can just refuse to sell at all. So the lack of a bona fide offer can result in overcharging. I think it's the refusal to sell at the 340B price because you have not complied with our conditions, whatever they may be. And I think it's that decision Congress gave HHS the enforcement authority here, in addition to the unqualified obligation that imposed on the manufacturers. And again, the manufacturers only have this obligation because they've chosen to be reimbursed under the Medicare and Medicaid schemes. They've chosen to receive federal funds in that instance. And this is an attachment corollary. You have to fulfill this obligation. And it makes sense that Congress imposed oversight of that in the federal government, rather than allowing private profit driven companies to determine when or when not they need to sell their drugs at a discount. Oversight, but no rulemaking authority for HRSA to set out respective criteria for this. About the contract pharmacies, that's correct. And that's why we think this is a pure question of law that this brought out to a result. And that's why we don't think there's anything left for the agency to do at this point. It really is up to the best reading of the statute. If we disagree with you on your statutory position and adopt some standard of bona fide offer, do you want us to apply that to consider to resolve the question about 40 mile radius, the reporting requirements in this case, or do you want us to leave it open for the agency to consider? Or I guess I'm just I'm worried. I'm not worried. I'm wondering about like what the left leave it open. We would say we would say the logic of the rationale the agency has tendered to us is a broad legal argument that no, no conditions are allowable. We reject that for reasons we've discussed. And then we don't decide just as just Friedrich did. We don't decide the 40 mile radius and the reporting. I worry is he reporting? I worry about a granular investigation about whether very specific policies are permissible. I know you don't like case by case. I'm just for this. Just for this reason, if I could pull it out. United Therapeutics, I think, represented that it's only going to take an hour a year. There are 700 different manufacturers and they would have to comply with it. If everyone had a claims data requirement, they'd have to comply with that. If everyone does 40 mile versus 20 mile, they'd have to comply with that. If they said doesn't mean one is discretion about whether that pharmacy did have to comply with that. That's why I think it is it's for me to say whether or not we can really analyze these individually because it is such a massive system. Are you you you said in your in your initial argument that the letters were both about the general policy and about the specific policy. And in the government's brief, they argue that we should decide the specific questions about whether these policies are consistent with the statute. And I think are you are you backing away from that position? No, no, no. If I can clarify, it's because we do think that these unilateral policies that are targeted at 340 covered entities are not permissible. Therefore, because these are policies that satisfy that criteria, being unilateral. Just circling, just circling back to argue. Yes, we think that's the best reading. I get that. I understand. I'm trying to be responsive, Your Honor, but that's why I think it's hard for me standing here right now to say that we can say that a unilateral policy that imposes just very little things isn't permissible. It's so you want us to decide the granular question about these specific policies if we do so in the government's favor, but not if we do so in the manufacturer's favor. It's possible for us to decide that these specific policies are inconsistent with 340B, but not possible on this record to decide that they're consistent with 340B. I mean, that's that's what I'm hearing you to say, and I'm not sure that makes sense as a logical matter. The reason that what I'm saying is because we have a pretty clear demarcation, you can't impose conditions versus we can impose reasonable conditions. Right now, I'm not really prepared to concede. Well, you can analyze this under a reasonableness rubric and make individualized determinations about what's reasonable and what's not for all the reasons that I've said. So I think for that reason, we're saying if you agree with our statutory construction, then these particular policies are invalid. If you disagree, and I'm trying to analyze this under a bona fide offer, I don't exactly know where this comes out, and that's why I was trying to ask about the follow up. Like, how do you actually make the determination? Is it a fact question? Are you trying to weigh particular burdens? And just because that's not the scheme that Congress set up, it didn't set up a weighing costs and benefits system here. The statutory structure says manufacturers and to sell the drugs. That's Charles. Nothing further. Thank you. Thank you to all counsel for a helpful argument. The case is submitted.
judges: Katsas, Rao, Childs